Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan van Keulen, Magistrate Judge

```
IN RE: ZOOM VIDEO              )
COMMUNICATIONS, INC.           ) NO. C. 20-02155-LHK
PRIVACY LITIGATION,            )
_____)
```

San Jose, California
Tuesday, February 16, 2021

<u>**TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS**</u>

<u>**APPEARANCES**</u>: (Appearances via Zoom videoconference.)

For Plaintiffs:

                    AHDOOT & WOLFSON, PC
                    2600 West Olive Avenue
                    Suite 500
                    Burbank, California 91505
          BY:   **THEODORE W. MAYA**
                **ATTORNEY AT LAW**

                    COTCHETT, PITRE & MCCARTHY, LLP
                    840 Malcolm Road
                    Suite 200
                    Burlingame, California 94010
          BY:   **TYSON C. REDENBARGER**
                **ATTORNEY AT LAW**

For Defendants:

                    COOLEY LLP
                    101 California Street
                    5th Floor
                    San Francisco, California 94111
          BY:   **KATHLEEN R. HARTNETT**
                **ATTORNEY AT LAW**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

| | |
|---|---|
| 1 | <u>**Tuesday - February 16, 2021**</u>                    <u>**10:01 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Please come to order.  The Honorable Susan |
| 5 | van Keulen presiding. |
| 6 | **THE COURT:**  Good morning.  Good morning, everyone. |
| 7 | Welcome to the 10:00 calendar. |
| 8 | We have a couple of discovery matters on this morning.  So |
| 9 | we will get underway.  Ms. Fanthorpe, if you'll call the first |
| 10 | matter, please. |
| 11 | **THE CLERK:**  Yes.  Calling 20-CV-2155, In Re: Zoom |
| 12 | Video Communications, Inc. Privacy Litigation. |
| 13 | Counsel, please identify yourselves for the record |
| 14 | beginning with plaintiff. |
| 15 | **MR. MAYA:**  Good morning, Your Honor.  Theodore Maya |
| 16 | for plaintiffs. |
| 17 | **THE COURT:**  Mr. Maya, good morning. |
| 18 | **MR. REDENBARGER:**  Good morning, Your Honor, Tyson |
| 19 | Redenbarger for the plaintiffs as well. |
| 20 | **THE COURT:**  Mr. Redenbarger, good morning. |
| 21 | **MS. HARTNETT:**  Good morning, Your Honor.  I am |
| 22 | Kathleen Hartnett from Cooley for defendant, Zoom. |
| 23 | **THE COURT:**  Ms. Hartnett, good morning. |
| 24 | **MS. HARTNETT:**  Good morning. |
| 25 | **THE COURT:**  All right.  We're on today pursuant to the |

**PROCEEDINGS**

1    parties' joint submission for -- it's essentially plaintiffs',

2    a motion to compel production.  The parties submitted a joint

3    statement; gave me a chart.  I did issue a preliminary order

4    last week on the 9th to give the parties some guidelines and

5    further instructions for meet and confer.

6         So I want to stick to the -- we'll use the categories that

7    were identified in the parties' joint statement.  And we'll

8    take the issues that way.  And if anything has been resolved or

9    where progress has been made, you can tell me as we move

10   through it one at a time, and where there are open issues,

11   we'll get those resolved and get you back underway.

12        So why don't we go ahead and start then, Mr. Maya or

13   Mr. Redenbarger, who has the mic today for plaintiffs, at least

14   to the first category?  Mr. Maya, all right.

15        The first category is third-party software integrations.

16   And as I indicated in my order, I do think that the plaintiffs

17   tri-level approach, such as it was, is workable.  But with

18   quantitative limitations.

19        So were the parties able to meet and confer?  Where is

20   there agreement and where are there still disputes?

21        Mr. Maya, I'll start with you.

22        **MR. MAYA:**  Thank you, Your Honor.

23        And, yes, we met and conferred.  We had two lengthy calls

24   on Friday and another yesterday, and we have exchanged letters

25   on Sunday and yesterday.

**PROCEEDINGS**

1        I just got a message that the recording has stopped.

2        **THE COURT:**  That's fine.  It looks like my courtroom

3    deputy dropped off, but that's fine.

4        **MR. MAYA:**  Okay.

5        **THE COURT:**  It's back.  We've got the typical Zoom

6    gremlins at work.  So -- welcome back, Ms. Fanthorpe, and we're

7    back on track.

8        Go ahead, Mr. Maya.  Yes.  Where were we?

9        **MR. MAYA:**  So, Your Honor.

10   Yes, we have met and conferred.  I think we have made

11   progress and thank the Court for its guidance in this order.

12   I am prepared and going to -- planning to speak to the

13   first category, third-party software integrations, today.

14   We think that the only other category we need to address

15   today is category 4, security misrepresentations.  And for the

16   plaintiffs, Mr. Redenbarger would be speaking to that, just to

17   give you a roadmap.

18       **THE COURT:**  Thank you.

19       **MR. MAYA:**  On the third-party software integrations,

20   we have had made some progress, but unfortunately there is

21   still a significant dispute between the parties.  We appreciate

22   the Court accepting our tri-level approach, which is set forth

23   in Exhibit 3 to that joint brief.

24       Zoom has agreed -- so, Your Honor, first of all, there is

25   three -- just to sum up those three levels that we've

**PROCEEDINGS**

1   discussed.  One is marketplace apps flagged as having a

2   security advisory by Zoom.  Zoom has informed us that there is

3   only one of those, the Marketo app, and has agreed to give

4   discovery concerning that, which we appreciate.

5            **THE COURT:**  Okay.

6            **MR. MAYA:**  The next is, third-party apps that are

7   found in Zoom's App Marketplace.  And we identified five

8   categories that we were willing to cut it down to for purposes

9   in the joint motion.  The Court found that still too many.  And

10  during our meet and confer process, Zoom has not agreed to give

11  us anything on any marketplace apps beyond the Marketo app that

12  I already discussed.

13       The third level is the SDKs, which like marketplace apps,

14  is another method through which Zoom is alleged to have shared

15  its users' PII, private information impermissibly.

16       There, Zoom has agreed to give us two snapshots of the

17  SDKs in place along with the description of their functionality

18  for August and November 2020.  We disagree that that's a good

19  time frame for this -- for these purposes.  That is, after Zoom

20  removed the Facebook SDK, for instance, which the complaint

21  includes many allegations about -- although our allegations

22  about Zoom's sharing of information through such SDKs is not

23  limited to the Facebook SDK, as Zoom contends.

24       So, Your Honor, we have asked them for, if they can

25  provide snapshots for earlier time frames.  They are looking

**PROCEEDINGS**

1   into that.  We do think it's important that we get snapshots,

2   like, from the February and April 2020 time frames, for

3   instance, that were different.  And we can identify the

4   versions of the app that we're looking for there --

5          **THE COURT:**  Okay.

6          **MR. MAYA:**  -- Your Honor.  And one thing I didn't

7   mention with respect to those marketplace apps is we have

8   attempted to compromise beyond the five categories identified

9   there in Exhibit 3.  We agreed to identify a hundred apps that

10  we think likely shared information.  Zoom rejected that.  We

11  agreed to limit ourselves to 50 in the first instance and Zoom

12  has rejected that compromise.

13         So, Your Honor, we would like at least -- if the Court

14  is -- you know, feels that the five categories is too much, we

15  would ask that we be permitted to, you know, in conjunction --

16  to work with our experts and identify 50 apps that we think,

17  based on what we can glean, are likely to bear fruit.  And

18  identify those to Zoom and get discovery in the identified RFPs

19  responsive with respect to those marketplace apps.

20         **THE COURT:**  All right.  Mr. Maya, with regards to the

21  SDK the snapshots, I just want to be sure I'm understanding

22  plaintiffs' position that you would like four snapshots:

23  February, April, August, and November of 2020; is that right?

24         **MR. MAYA:**  Zoom has asked us to identify them by

25  version of their software, rather than month.

PROCEEDINGS

 1          **THE COURT:**  Okay.

 2          **MR. MAYA:**  Your Honor, I have a list that is broader

 3    than that, but if we can get four, that would be great.

 4          **THE COURT:**  Four snapshots and they would be

 5    identified by:  We want a snapshot of this version, this

 6    version, and this version.

 7          Is that correct?

 8          **MR. MAYA:**  We can do it by month or version, but Zoom

 9    has told us it would prefer version; we can do that.

10          **THE COURT:**  Okay.  And your understanding is -- and

11    I'll turn to Ms. Hartnett obviously in just a moment -- but

12    your understanding is that Zoom has agreed to the August and

13    November snapshots; is that right?

14          **MR. MAYA:**  Zoom volunteered those time frames.  Those

15    are not time frames that we identified.

16          **THE COURT:**  Okay.

17          **MR. MAYA:**  My understanding is that Zoom already has

18    that information on hand and that's why they are proposing

19    those time frames.

20          **THE COURT:**  All right.  All right.

21          Okay.  So as to the first category, the marketplace app

22    where there had been a security advisement, the parties are in

23    agreement.  Zoom identified one and that will be produced, and

24    so that issue is -- has been addressed; correct.

25          **MR. MAYA:**  That's correct, Your Honor.

PROCEEDINGS

1    **THE COURT:**  Okay.  And then we have the large, open

2    issue around marketplace apps.  Okay.

3    All right.  Ms. Hartnett, did Zoom make any kind of

4    counter on the marketplace apps?  Where are we in terms of meet

5    and confer efforts?

6    **MS. HARTNETT:**  Thank you so much, Your Honor.

7    And I don't -- if I could just take a brief step back just

8    to kind of explain how we got to the three-tier approach, I can

9    hopefully inform why we are sort of approaching it the way we

10   are, which is willing to work with them on the SDK issue, but

11   really concerned about the Marketplace app discovery just being

12   unjustified.

13   So basically they had -- we had been looking at these two

14   categories together and then, right before the joint statement

15   was submitted is when they put the three-tier structure in; we

16   hadn't really met and conferred on that.  We had been looking

17   at the universe of apps beyond the three that are pled in the

18   complaint as sort of a collective universe.

19   And just to be clear on that as well -- so their complaint

20   actually has three specific, you know, pieces of software that

21   they are claiming create a problem.  This is the Facebook

22   software development kit; the Google Firebase analytics SDK or

23   software development kit; and then LinkedIn Sales Navigator.

24   And so the Sales Navigator was a marketplace app.  The

25   other two are SDKs.  Your Honor may well be familiar with this

PROCEEDINGS

1   but SDKs actually parts of, like, software pieces that are

2   building blocks that can be used in Zoom's actual software.

3          And so to the extent that Zoom had incorporated SDKs in

4   its own product, Zoom Meetings -- so that's what we're, you

5   know, this case is all about, the -- some specific privacy and

6   security allegations about the Zoom Meetings product, Zoom was

7   willing to negotiate with -- and we actually don't think there

8   are SDKs beyond the two they have alleged are relevant.  On the

9   other hand, information about what SDKs are in our product is

10  not something that is as easily publicly available to them --

11   (Court reporter interruption for clarification of the record.)

12          **MS. HARTNETT:**  Apologies.  Sorry.  I hear you.

13         Just to back up, information about the SDKs is not

14  necessarily publicly available or evident to the plaintiffs.

15  And so Zoom believed that if we're going to expand beyond the

16  three integrations pled, that we should be doing that by giving

17  them information about SDKs, at most.

18         On the other hand, the app marketplace is a publicly

19  available website.  The plaintiffs are able to go to that

20  website and look at all the apps.  They can download them and

21  try to figure out if there is an issue with any particular one.

22  And they have done none of that.

23         So the LinkedIn Sales Navigator was something that came to

24  light through some public reporting last spring, when Zoom

25  became a popular product.

1    And there were certain news reports about people possibly

2    having their anonymity inadvertently exposed through this

3    integration.  No plaintiff in this case actually alleges to

4    have used or been exposed to this, but that's one of the

5    theories that they have specified.  And so our concern is

6    taking that already very weak thread, any connection to

7    LinkedIn, which is at least pled, and connecting that to 50,

8    100, 300, 1,000 marketplace apps is just not relevant to the

9    actual claims in the case.  It's disproportionate and it's

10   actually distracting us from trying to meet the March 5th

11   deadline with respect to the discovery about the actual claims

12   in the case.  So, again, we don't --

13       THE COURT:  So what is it that you are being asked to

14   produce -- and I'll let Mr. Maya also address this.  But, with

15   regard to the marketplace apps, what is it that they are asking

16   for?

17       MS. HARTNETT:  Our -- there hasn't been a limitation.

18   I think -- we can look back to the actual request itself, but

19   it wanted to discovery into all third-party integrations used

20   by --

21       THE COURT:  Hold on, Ms. Hartnett.  Ms. Hartnett, hold

22   on because you're breaking up.

23       MS. HARTNETT:  My apologies.

24       THE COURT:  That's all right.  I don't think it's

25   intentional on your side.  I want you to slow down, though.

 1   And if you speak slowly, that may help.  You may be able to

 2   stay up -- the Internet may be able to --

 3          **MS. HARTNETT:**  Keep up with me, I hear you.

 4       So there is not really a limitation on what they seek

 5   about the third parties' integrations beyond the ones pled in

 6   the complaint.  They were just asking for documents related to

 7   those integrations.

 8       With respect to the SDKs, our proposed compromise was to

 9   give them a list of them, a description of the functionality,

10   user information, if any, that is transferred and any

11   information about remuneration.  And that was for purpose of a

12   compromise.

13       And we really are prepared to in good faith work with them

14   on the SDK point.  But simply looking on the Internet they

15   could find out what they need to find out about the marketplace

16   apps.  They can decide if there is one that has an issue, like

17   they did with the Marketo app, and we would be open to hearing

18   that.

19       But the notion of just opening the door into discovery

20   about all information concerning things where they are not

21   relevant to the complaint, and they haven't identified any

22   issues is something that, to us, just seemed unfair and

23   inappropriate; and also just a tiered structure that was

24   imposed at the last minute for no real reason, although we

25   understand why Your Honor would have seen it as something

**PROCEEDINGS**

1   coherent the way it was presented.

2          **MR. MAYA:**  May I respond, Your Honor?

3          **THE COURT:**  Yes, Mr. Maya.  But I want you to respond

4   specifically with regards to the marketplace apps.  If they are

5   available online and you can download an app and see if it has

6   any issues that might make it relevant to your claims.

7          **MR. MAYA:**  Sure, Your Honor.

8          **THE COURT:**  Let me just -- let me give you this

9   additional insight.

10         In approving the tiered structure, obviously, you know,

11  thus looking for structure, I was, as you could tell from my

12  order, most concerned about this marketplace because the idea

13  of getting hundreds of apps, or even 50 apps with no tie to any

14  allegations in the complaint is -- is not proportional to the

15  issues that are currently before the Court.

16         So, you know, if you -- I am looking at a -- if you got an

17  app in each of the five categories.  But it would seem to me --

18  that's what I'm thinking.  But to go there, even, there would

19  have to be justification.  And it seems like, to Ms. Hartnett's

20  point, you could go to the app marketplace, you can pick one,

21  you can pick three, you can pick five in each of these

22  categories; download them; look at them; turn them over.  And

23  then make a request saying:  Look.  We've looked and we're

24  seeing this, and this is what we need.

25         That would seem --

**PROCEEDINGS**

1          **MR. MAYA:**  Okay.

2          **THE COURT:**  -- to be a reasonable approach.

3          **MR. MAYA:**  Two points there.  One, the idea that it's

4    not tied to the allegations in our complaint.  It is.  Our

5    allegations -- for instance, we allege that Zoom violates

6    plaintiffs' and class members' privacy by failing to implement

7    adequate review of these apps before integrating them.  And

8    there is a variety of other allegations.

9          The LinkedIn app, which is the one that we know operated

10   to violate privacy, users would have no idea.  They didn't have

11   to have that app downloaded on their end.  And that's how these

12   apps work, or can work.

13         And contrary to Zoom's contentions, it's not at all clear

14   how these apps work from looking at them online and what

15   information they obtain.

16         However, our request asked for things like audits or

17   investigations that Zoom or perhaps third parties employed by

18   Zoom had done into these very issues.  We're not asking Zoom to

19   create information or give us anything that it -- isn't already

20   in its possession, custody, or control, just to be clear.

21   But --

22         **THE COURT:**  What are you asking for?

23         **MR. MAYA:**  Well, there is a variety of requests

24   identified in category 1, and I would refer to the joint

25   discovery brief.

**PROCEEDINGS**

1    But, for instance, what I'm referring -- you know, that

2    refers to RFP1 which is very broad.  And, two, there are other

3    requests such as Request 14, which are looking for, like I

4    said, audits or analyses done by Zoom, or third parties.

5    We also have requests looking for -- aimed to get anything

6    that may have been produced to the Government, or any

7    government agency during those investigations, which have

8    occurred.

9    So I think to cut all that stuff off on the basis that

10   there is just too many apps is not fair.  Our requests are not

11   necessarily looking -- you know, like that.  We are looking for

12   investigations, audits, things like that.  Furthermore --

13        **THE COURT:**  Excuse me, Mr. Maya.  Part of the problem,

14   of course, is the number and breadth of the requests; right?

15   Part of it is:  What are the requests focused on here,

16   marketplace apps?

17   And the other piece of that is:  But what are you asking

18   for?

19   It's the breadth of the requests.

20   So I'm going to put the marketplace apps on -- I'm going

21   to defer a ruling on that, and I want you to meet and confer.

22   And if you want to know if there have been audits, security

23   audits, or a report to the Government, something very specific,

24   you know, a couple of things as to some small number of apps in

25   each category, I'll consider that.  But I want the parties to

**PROCEEDINGS**

1  go back and meet and confer on that.

2      But it sounds like there needs to be -- before I open the

3  door on all of these marketplace apps, on the request side

4  there needs to be a narrowing down in light of the

5  proportionality requirements.

6          **MR. MAYA:**  Understood.

7          **THE COURT:**  So that's how we'll handle the marketplace

8  apps.  I'm giving the parties more direction and I want you to

9  meet and confer on that.

10     With regards to the SDKs, now, let me turn back to

11  Ms. Hartnett, because I didn't hear a response to Mr. Maya's

12  point of:  Well, give us four snapshots by version, as opposed

13  to just two.

14     Why is that not a reasonable approach?

15         **MS. HARTNETT:**  Your Honor, we are open to that, and

16  what we had told the plaintiffs was that we were just checking

17  on the technological feasibility.  As Mr. Maya reported, we

18  happen to have that information.

19     We weren't picking August and November of this year to

20  exclude anything.  It was because the information happens to be

21  available more readily, and so the tool that was used to

22  extract that information in August and November, we need to see

23  if it will function for the older versions.  And so we were in

24  the process of meeting and conferring on that point.

25         **THE COURT:**  Okay.  All right.

1          And when do you anticipate to have a response as to

2     whether you can provide the information for snapshots for

3     February and April?

4          **MS. HARTNETT:**  I believe in the next day or two, we

5     just need to check with the technical people at our client's

6     side.

7          **THE COURT:**  Okay.  All right.

8          Then for the third category, that would be to produce four

9     snapshots.  And if you believe you have information that it's

10    not available or not retrievable, the parties can meet and

11    confer on that, but -- you know, and I will hear further if the

12    parties can't work that out.  But, for now, the order is to

13    produce those four snapshots.

14         **MS. HARTNETT:**  Understood, Your Honor.

15         **THE COURT:**  Let me get my notes up to date here.

16         All right.  That's the first category.

17         And, Mr. Maya, you said then, the open issue was the

18    fourth cat -- excuse me.  Yes, the first category of dispute

19    and you said the remaining open issue was in the fourth

20    category; is that correct?

21         **MR. MAYA:**  That's correct, Your Honor.  And I'll allow

22    Mr. Redenbarger to speak to that.

23         **THE COURT:**  Okay.  This is with regards to the

24    security misrepresentations.  And I had tentatively -- my

25    tentative ruling was to accept the defendant's proposal, which

PROCEEDINGS

1    is to produce the -- excuse me, let me just track my note here.

2         To accept the defendant's proposal as set forth in

3    Exhibit 3 to the joint letter.  But, I did let the plaintiffs

4    know that if there was an issue with regards to the end-to-end

5    encryption, it wasn't quite clear to me why that would be a

6    problem.  But I would certainly let you be heard on that.

7         So, Mr. Redenbarger, I'll start with you, and then I'll

8    come back to you, Ms. Hartnett.

9         **MR. REDENBARGER:**  Thank you, Your Honor.

10        So there are two issues that I would like to discuss.  One

11   being the end-to-end limitation, and the second one being a

12   distinction between "enterprise" and "non-enterprise" clients.

13        So first with respect to --

14        **THE COURT:**  So let's start in the upper left-hand

15   corner.  Remind me what it is you're asking for here and what

16   the responses have been so far.

17        **MR. REDENBARGER:**  Sure.  So this category has to do

18   with Request 17 through 20 that focus specifically on

19   representations regarding Zoom's ability to provide encryption,

20   encryption of their meetings.

21        The plaintiffs have alleged that in early 2020, 2020, Zoom

22   wasn't capable of offering end-to-end encryption and, in fact,

23   Zoom wasn't capable of doing that until October of 2020.

24        So the important time period in this case involves a time

25   when Zoom just didn't have the capability to provide end-to-end

1   encryption.  And so plaintiffs don't believe that discovery

2   should be limited by an "end-to-end" term, it would exclude

3   potential relevant information.

4        And the parties, having seen your order, did meet and

5   confer on this issue, and we do agree on the scope.  So the

6   parties agree that the scope should include the time period

7   when Zoom allegedly did not have end-to-end encryption, and the

8   discovery should include all the information related to

9   whatever version of Zoom services pre and post when they

10  actually were able to offer end-to-end encryption.

11            **THE COURT:**  Okay.

12            **MR. REDENBARGER:**  So we did make progress there.

13            **THE COURT:**  Okay.

14            **MR. REDENBARGER:**  However, we then ran across another

15  dispute relating to how to appropriately collect that

16  information.  And the dispute arose when plaintiffs suggested

17  the use of a search term such as "encrypt," which, in this case

18  which involves encryption is, frankly, a common sense search

19  term.  You know, we're dealing with a lot of claims related to

20  encryption, so we proposed the search term "encrypt," which

21  Zoom has rejected and continues to stand by the idea that this

22  discovery should be limited to "end-to-end," should have some

23  sort of narrowing, either a search term or scope that focuses

24  only on end-to-end; which, you know, for these reasons we don't

25  believe is appropriate.

**PROCEEDINGS**

1      **THE COURT:**  And the reason that the plaintiffs don't

2  want that limitation or don't believe that limitation is

3  appropriate is because the timing, because there is not

4  end-to-end encryption until late in the year?

5      **MR. REDENBARGER:**  Correct.  During the relevant time

6  period, there simply wasn't end-to-end encryption.  And in

7  addition to that, internally at companies, it's unlikely that

8  every time Zoom refers to their encryption, they refer to it as

9  "end-to-end encryption."  So we believe it's more appropriate,

10  when discussing encryption, that a search term would be rooted

11  with that base word of "encrypt."

12      So that's where the dispute on that issue is at this

13  point, according to --

14      **THE COURT:**  That's really around search terms, how to

15  identify what you're looking for; is that right?

16      **MR. REDENBARGER:**  Yes.  Because we've agreed as to the

17  scope.  The parties agree this is within the scope of

18  discovery, and now we've moved on to the next aspect of that.

19      So any guidance the Court is inclined to provide on that

20  search term issue, that would be helpful.

21      **THE COURT:**  Okay.

22      **MR. REDENBARGER:**  The second part has to do with the

23  distinction between "enterprise" and "non-enterprise" clients.

24  So an enterprise client is someone who bought Zoom by

25  contacting the sales department.  A non-enterprise client is

1   someone who went through the website, and clicked through the

2   Internet to buy service.  So that's the distinction.  They --

3   as far as we know, they still bought the same service so the

4   actual product doesn't differ, it's just how they ended up with

5   it.

6       And so generally in this case, plaintiffs don't agree to a

7   limitation to the non-enterprise clients.  Zoom has been

8   attempting to limit discovery to non-enterprise clients.

9       And here there is a specific dispute as to Request 17.

10  Plaintiffs asked for a valuation and financial metrics related

11  to the -- what a customer may have paid for certain levels of

12  encryption, and that goes to plaintiffs' damages claims.

13      Zoom's proposal sought to limit that to the non-enterprise

14  clients only, which we don't believe is appropriate.

15  Regardless of which -- what customer paid for the services, any

16  valuation on this encryption service would be relevant to our

17  damages claims, because one of our key claims is that

18  plaintiffs received less than what they paid for.

19      They thought they were buying an end-to-end encrypted

20  service; they weren't receiving that.  If enterprise clients

21  were receiving something different or paying on a different pay

22  structure, that would be relevant information.

23      And that's why we think just specifically Request 17,

24  which is narrowly tailored to this issue shouldn't be limited

25  by a distinction between "enterprise" and "non-enterprise."

PROCEEDINGS

1    **THE COURT:**  So your argument for not having that

2    limitation, not making that distinction is limited to

3    Request 17; is that correct?

4    **MR. REDENBARGER:**  Yes, it is for -- that's how we

5    presented it in our joint statement.

6    I'll note that Zoom doesn't raise that imitation as to any

7    other of the requests, other than 2, 60, and 66.  And generally

8    plaintiffs object to that limitation.  But for purposes of

9    today, yes, it's Request 17 that's at issue.

10   **THE COURT:**  Okay.  And your putative class is -- is it

11   all users?  What is it?

12   **MR. REDENBARGER:**  Yes.  Thank you.

13   That -- the class would -- it doesn't necessarily exclude

14   the enterprise clients.  Plaintiffs' class may include -- very

15   likely include enterprise clients, so that is another reason

16   why this discovery would be relevant.

17   **THE COURT:**  All right.  Okay.

18   Ms. Hartnett, first issue is the appropriate search terms

19   to deal with the encryption, the scope on the encryption point.

20   So I appreciate the plaintiffs' proposal is "encrypt."  That

21   could lead to a lot of irrelevant material.  "End-to-end,"

22   perhaps is too colloquial to be of much use.

23   What is Zoom's proposal?

24   **MS. HARTNETT:**  Thank you, Your Honor.

25   Just on this issue, I don't think we have a live dispute

1   before you today because we just received plaintiffs' proposed

2   search terms yesterday.  We had sent search terms about all our

3   topics to them a couple of weeks ago, and we had asked them to

4   get us back counter-terms so we can run -- get hit counts and

5   get a sense of whether or not -- which ones are unduly

6   burdensome.  So I don't think it's correct, as Mr. Redenbarger

7   suggested that we've said no; although we strongly indicated

8   that an "encrypt" term alone would likely return massive

9   numbers of irrelevant documents.  And so we would want to work

10  on that search.

11       So we have not yet, as I mentioned, we have not yet really

12  met and conferred on the search term issue.  What we have done

13  is realized that we were talking past each other about scope.

14       Because -- and I don't need to argue the merits here --

15  part of their whole argument is that Zoom was saying its

16  product was end-to-end encrypted over the last couple of years

17  when, in fact, according to plaintiffs it was not.  And so when

18  we said we would produce on end-to-end encryption we were not

19  trying to exclude the encryption in our pre-2020 product.  We

20  were trying to describe it.

21       And so therefore, terms like "end-to-end encryption," in

22  our view, are actually going to return the relevant documents

23  from our internal documents because that's how people refer to

24  the product.

25       And so, I think what I would say at this point is that we

1   should be permitted to a meet and confer with the plaintiffs

2   about search terms.  They proposed a list of 125 or more to us

3   yesterday, and we have not yet had time to digest that or run

4   the hit counts to figure out what is going to be viable in

5   terms of incorporating those search terms going forward.

6          **THE COURT:**  Well, assuming and your response is -- I

7   mean, it sounded like from Mr. Redenbarger's recitation and

8   from what you just said that, Zoom has already indicated that

9   using "end-to-end," coupling "encrypt" with "end-to-end" is

10  where it's headed.  And they have already -- they, plaintiffs,

11  have voiced their disagreement with that.  Are you telling me

12  that Zoom will work on that or -- I mean, if that's the

13  position, then let's just go ahead and deal with it.

14         **MS. HARTNETT:**  No, Your Honor.  I just do think,

15  genuinely, we need more time to confer on this.  This is not an

16  attempt to go -- I'm just worried about taking on a burden

17  that's going to make completing our production not possible.

18         We had sent them a list of search terms, I believe, on

19  February 5th and it had several terms related to end-to-end,

20  and the list they sent yesterday, they did have "encrypt"

21  exclamation point, as one of their search terms.  They also had

22  some additional, more narrow formulations that would include

23  additional within certain number, another word, that type of

24  thing.

25         We have not yet assessed those.  And so it really is

**PROCEEDINGS**

```
1   premature at this point to resolve a search terms dispute

2   before you.  We're happy to have those negotiations quickly, so

3   if there needs to be another dispute before you, it can come

4   back.

5              THE COURT:  Okay.  All right.

6              MS. HARTNETT:  And then -- sorry.

7              THE COURT:  That's all right.  Let me just make a

8   note.  Let's get through those, and if there is any further

9   dispute -- because I am mindful of the calendar, and -- as are

10  the plaintiffs, as are all the parties -- and the class

11  certification date, and the document production date that I had

12  set out in my order.

13       So let's, you can meet and confer further and get back to

14  me if the parties are unable to agree, then make a submission

15  to me on the search term for category 4, a joint submission by

16  noon on Thursday.

17             MR. REDENBARGER:  Your Honor, if I may.  Zoom sent us

18  a letter yesterday indicating that the term "encrypt" was not

19  viable.

20             THE COURT:  Okay.

21             MR. REDENBARGER:  So to the extent we're reopening

22  that discussion --

23             THE COURT:  What I hear Ms. Hartnett saying is there

24  are some other limitations that plaintiffs had proposed that

25  had not yet been assessed.  That "encrypt" by itself was not
```

1   viable.  It sounds like perhaps the conversation isn't yet

2   concluded.  So it sounded like you've taken -- plaintiffs have

3   taken the constructive approach of offering some other possible

4   limitations.

5       So I think it is appropriate to say, I think "encrypt" by

6   itself sounds too broad.  "End-to-end" sounds too narrow.  So

7   with that guideline and it sounds like there has already been

8   some proposals from plaintiff, so Zoom will have to roll up its

9   sleeves and take a hard look at those.  And you all can discuss

10  them.

11      And if you can't agree, get back to me and give me some of

12  the, you know, additional narrowing search terms that

13  plaintiffs have proposed.  And, you know, I'll hear the parties

14  briefly, maybe.  Maybe I'll just look at it on the papers and

15  we'll get it resolved.

16          **MR. REDENBARGER:**  Thank you.

17          **THE COURT:**  Okay.  So let's turn to the

18  "enterprise/non-enterprise" issue.  Just in the context of

19  Request 17, which is for the business valuation of encryption

20  capabilities.

21      Ms. Hartnett?

22          **MS. HARTNETT:**  Thank you, Your Honor.

23      So I do think that Mr. Redenbarger accurately described

24  the main distinction between the enterprise and the

25  non-enterprise products, which is that they get individually

1    negotiated when they are enterprise.  And, therefore, as you

2    said, they don't end up with the product through the same

3    process.

4         I think that our view is that the enterprise customers

5    could never be part of the class in this case.  There are 14

6    plaintiffs, all of them are either individuals or there are two

7    churches, small businesses, all of which, to the extent they

8    purchased something from Zoom was the off-the-shelf version of

9    the product.  And therefore, our view is that it begins to

10   unduly expand this case to start encompassing enterprises

11   which, as you're familiar, are the larger corporations that use

12   and deploy -- they are the ones that essentially used Zoom

13   before Zoom became something that everyone uses.

14        And so because they have no plaintiff that is an

15   enterprise customer and they would not be able to represent

16   those plaintiffs as part of their class, we took the -- took

17   the view that we need to constrain the discovery in this matter

18   to non-enterprise customers.

19        And here, to the extent there would be some damages theory

20   that plaintiffs are going to construct for this upcoming class

21   cert motion or otherwise, it would be about the damage and the

22   potential harm to those people that are in their class, or

23   their putative class, which would have to, by necessity --

24   given that they have no enterprise plaintiff -- be

25   non-enterprise customers.

1      And, again, this is an effort to continually try to pare

2  down what started out as extremely broad requests about any

3  security or privacy issue for anyone in trying to tailor them

4  to the actual plaintiffs and claims in this case, and the class

5  that they could actually represent if they get to that point.

6          **THE COURT:**  All right.

7          **MS. HARTNETT:**  Sorry.  I just would -- I just -- one

8  other distinction that might be relevant is that the enterprise

9  customers typically have a sophisticated IT department that

10  would be engaging with Zoom and helping to negotiate and figure

11  out what configuration works with the enterprise.  And so I

12  think some of the representations about it essentially being

13  the same product are not accurate.  We don't need to get into

14  them here because we just think it's categorically not at issue

15  in this case.

16          **THE COURT:**  All right.  Final word, Mr. Redenbarger?

17  It's your motion, final word.

18          **MR. REDENBARGER:**  Thank you.

19      So putting aside whether enterprise clients are in the

20  class, this is still relevant information, what a customer may

21  have paid for a certain level of encryption; that can help

22  guide plaintiffs' damages analysis in our claim.

23      Another important point is that Zoom has in the past

24  distinguished who gets what levels of encryption.  So, for

25  example, in June of 2020, Zoom announced that paid customers

**PROCEEDINGS**

1  would be getting the better level of encryption, and free

2  customers would be not.

3      So we're not coming up with these distinctions.  It's Zoom

4  who has, at times, placed different restrictions on who

5  receives what level of encryption.  And what Request 17 asks

6  is, you know, is there any internal valuation of that financial

7  metric.  And, again, this is very limited issue.  We're not

8  taking discovery on all enterprise clients at all.  It's

9  related to this one valuation issue and we believe it's very

10  relevant.  So --

11      **THE COURT:**  All right.  Thank you.  Okay.

12      On category 4 I'm going to, with regards to the

13  "enterprise/non-enterprise issue," I will remain with my

14  tentative ruling, which is to accept the defendant's proposal

15  and limit it to the non-enterprise.

16      I appreciate plaintiffs' argument, but I don't see

17  valuation of any features of the app in the enterprise context

18  as relevant to the case at this time.  At this time.

19      And that may change once you have class certification and

20  the parameters are drawn.  It may change as discovery goes

21  forward.  So at this time as to Request 17, for business

22  valuation, I will stay with my ruling to limit that to

23  non-enterprise.

24      As to the search term issue, the parties, as I said a

25  moment ago, are to meet and confer further over narrowing and

1   finding some common ground between "encrypt" and "end-to-end."

2   And I hope with that guidance you're able to.  If not, make a

3   submission to me by noon on the 18th.

4       And you have my ruling from category 1.

5       So that, I think, takes care of all the open issues before

6   us for today.

7       Mr. Maya, was there anything that I overlooked?

8           **MR. MAYA:**  Well, just, Your Honor, we're supposed to

9   meet and confer regarding the Marketplace apps, I believe.

10          **THE COURT:**  That's right.

11          **MR. MAYA:**  And I do hope that we're able to resolve

12  the dispute through that process; but in the event we're not

13  able to, should we be addressing that in our Thursday --

14          **THE COURT:**  Yes, exactly.  That would make sense.

15  We'll do that all in one.  And, again, on the Marketplace apps,

16  it's got to be narrowed on both ends.  On -- narrowed requests

17  focused to a narrow set of apps, and I will consider the issues

18  of relevance and proportionality in that context.  Right now,

19  it's too big to even sort.

20          **MR. MAYA:**  Your Honor, speaking to proportionality,

21  there was a point that I didn't get to make there that I think

22  might be helpful.

23      Is that, you know, we have looked into, with experts,

24  employing man-in-the-middle technologies and looking at network

25  traffic to try and figure out what information is getting

**PROCEEDINGS**

1  transmitted to what third party through these apps.

2      That -- to test all the apps, it would cost about

3  $5 million.  The cost is very high.  And that's why we do think

4  it would be appropriate to just get the documents that Zoom

5  has, whatever it may have, on these issues.

6          **THE COURT:**  All right.  Okay.  Thank you.  This

7  matter --

8          **MS. HARTNETT:**  Your Honor?

9          **THE COURT:**  Yes?

10         **MS. HARTNETT:**  Can I just speak to -- one word,

11  briefly on timing because you did order by March 5th us to

12  produce, and I wanted to update you on that.

13      We are about 25 percent, approximately, to the point of

14  completing what we had agreed to produce as of the joint

15  statement.  We have about 31 contract reviewers working on

16  this; we have three review project managers; and we have seven

17  attorneys at Cooley focused on this part of the case, on the

18  document production.

19         **THE COURT:**  Right.

20         **MS. HARTNETT:**  We can make our March 5th deadline as

21  far as we know currently, based on the list of custodians and

22  terms we are using, and based on the scope that we were doing

23  as of the joint statement.  I just wanted to flag for

24  Your Honor that an expansion into a bunch of Marketplace apps

25  or encryption search terms, that would be much broader will

**PROCEEDINGS**

1    make March 5th harder, and possibly not possible.

2         So I don't mean to get ahead of where we are.  I just

3    wanted to flag for you that we're working in good faith to meet

4    your deadline, and think we can do it; will do it.  But to the

5    extent it's a much broader universe of documents, that will be

6    harder.

7         And a lot of those documents, we respectfully submit, are

8    not relevant to class certification.  So to the extent that

9    that's an issue, that might inform the timing of additional

10   orders, we can flag that for you on Thursday if we are unable

11   to agree.

12        **THE COURT:**  I would expect that issue specifically --

13   let's say the parties are able to come to some agreement around

14   the Marketplace app issue, but for the timing, I would expect

15   that to be on the table and thoroughly vetted by the parties

16   through meet and confer.  Because it's putting -- the March 5th

17   deadline is driven by the class certification deadline.  And

18   that way, plaintiffs have all the information they need as to

19   whether or not -- if they get something they are asking for in

20   discovery, whether or not they need it for class certification;

21   whether or not if it is so critical that this is an issue to

22   raise with Judge Koh on scheduling.

23        So I expect those issues to be thoroughly, thoroughly

24   vetted by the parties before it gets to me.  Because it's

25   really being driven by the trial court schedule, and plaintiffs

**PROCEEDINGS**

1   may need to make some choices or one of those choices, perhaps

2   seeking relief.  But let's be sure that they have a full and

3   clear understanding.  It's not good enough just to say:  Well,

4   this is a lot more work and it's going to take a lot longer.

5        There needs to be, you know:  Here are milestones.  Here

6   is where we can reach them.  Here are the resources we're

7   putting to it and here is the deadline.

8        So, again, I'm very pleased.  The parties obviously have

9   been talking.  This is a complicated case.  There is a lot of

10  ground to cover.  So I want the parties to keep that up.  Okay?

11       All right.  I'm going to move to the next matter.  Thank

12  you all very much.  Thank you for your preparation today.  I

13  appreciate it.

14           **MS. HARTNETT:**  Thank you.

15           **THE COURT:**  I'll hear from you, if necessary, on

16  Thursday.  Thank you.

17           **MS. HARTNETT:**  Thank you, Your Honor.

18           **MR. MAYA:**  Thank you, Your Honor.

19               (Proceedings adjourned at 10:49 a.m.)

20                       ---o0o---

21

22

23

24

25

1

2                    <u>**CERTIFICATE OF REPORTER**</u>

3          I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6    DATE:    Sunday, February 21, 2021

7

8

9

10   _____

11        Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
             Official Reporter, U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25